Alan McSURELY and
Margaret McSurely

v.

John K. McCLELLAN, et al.,
Appellants,

Thomas Ratliff, Individually and as
sometime Commonwealth Attorney
For Pike County Kentucky.

No. 83–1444.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1984.
Decided Jan. 18, 1985.

Marc Johnston, Atty. U.S. Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., U.S. Dept. of Justice, Joseph E. diGenova, U.S. Atty. and Barbara L. Herwig, Atty., U.S. Dept. of Justice, Washington, D.C., were on brief, for appellants.

Morton Stavis, Hoboken, N.J., with whom Randolph M. Scott-McLaughlin, Charles N. Mason, Jr., Washington, D.C., was on brief, for appellees, Alan and Margaret McSurely.

Philip A. Lacovara, Thomas D. Goldberg and John D. Echeverria, Washington, D.C., were on brief, for appellee, Thomas Ratliff.

Before MIKVA, GINSBURG and STARR, Circuit Judges.

Opinion for the Court PER CURIAM.

PER CURIAM: *

### INTRODUCTION

On the evening of August 11, 1967, local law enforcement officials of Pike County, Kentucky, entered Alan and Margaret McSurely's home and seized a huge quantity of books, papers, and other personal effects. The officials arrested the McSurelys and charged them with violation of Kentucky's anti-sedition statute. Thus began the McSurelys' seventeen-year odyssey through the courts. They have been involved in four lawsuits here and in the Sixth Circuit, all of which arose from the events of August 11. This court alone has rendered five decisions involving the McSurelys and has issued nine separate opinions filling nearly one·hundred and fifty pages of the Federal Reporter. Today we seek to end another episode in the McSurelys' quest for judicial relief and compensation stemming from the events that began on that night seventeen years ago.

At issue in this appeal are the McSurelys' claims for damages against three federal government officials—a Senator and two members of his staff—for alleged violations of certain of the McSurelys' constitutional and common law rights. Those officials are Senator John McClellan, former chairman of the Permanent Subcommittee on Investigations of the Senate Government Operations Committee (the Subcommittee), Jerome Adlerman, former general counsel of the Subcommittee, and John Brick, a former Subcommittee investigator. (All three defendants died while this case was pending. Although parties were substituted when deaths occurred, for convenience we will refer to the three officials collectively as the Senate defendants and discuss them as if they were still the named defendants here.) The Senate defendants became embroiled in this controversy when John Brick went to Kentucky in October 1967 to inspect the material seized from the McSurelys' home. Without the McSurelys' knowledge or consent, Brick looked through the material and took back to Washington copies of over two hundred items, including papers of a highly personal nature.

The McSurelys also named Thomas Ratliff as a defendant in this suit. Ratliff was the Kentucky official who gave Brick access to the McSurelys' papers. Because of a recent settlement agreement between him and the McSurelys, however, Ratliff has been removed as a party defendant on appeal.

The jury returned verdicts against each Senate defendant for violating the McSurelys' first and fourth amendment rights under the United States Constitution and their right to privacy under the common law. The Senate defendants appeal from those verdicts. The allegedly unlawful conduct that underlay the verdicts against all three defendants was Brick's inspection and transportation of the documents back to Washington, and the manner in which he ultimately returned personal papers to the McSurelys. The McSurelys alleged that Senator McClellan and General Counsel Adlerman entered into a conspiracy with Brick to violate the McSurelys' rights and that, as coconspirators, they are liable for Brick's conduct. ·

Although the McSurelys' factual allegations are fairly straightforward, the legal issues surrounding their claims are extremely complex, as this opinion and prior decisions of this court indicate. For the reasons stated below, we affirm the verdict against the investigator, John Brick, for violation of the McSurelys' right to privacy under the common law. We reverse, however, all of the other verdicts.

### FACTUAL BACKGROUND

We have narrated the factual background of this case on numerous occasions. The appendix to this opinion sets forth a list and brief description of the federal court decisions that have affected the

---

* While this opinion is *per curiam,* Judge Ginsburg was primarily responsible for Parts I, II, and III, and Judge Mikva was primarily responsible for the remaining parts.

McSurelys over the last seventeen years. We summarize that history only briefly here.

In 1967, Alan and Margaret McSurely were field organizers in Pike County, Kentucky, for a civil rights organization known as the Southern Conference Educational Fund, Inc. On August 11 of that year (unless otherwise stated, all dates refer to 1967), county officials obtained an arrest warrant charging Alan McSurely with sedition against the state under Ky.Rev.Stat. § 432.040. They also obtained a warrant to search the McSurelys' home for "seditious matter." Pursuant to that warrant, over a dozen men, many of them armed, came to the McSurelys' home and seized all of their papers, several hundred books, and some of their clothing. Both Alan and Margaret McSurely were arrested and charged with sedition.

The Pike County prosecutor at the time, Thomas Ratliff, helped to organize the search and arrests. Ratliff had responsibility for prosecuting the McSurelys under the sedition statute. His involvement in this case is chronicled in more detail in *McSurely v. McClellan,* 697 F.2d 309 (D.C. Cir.1982). The day after the search, Ratliff stated publicly that he intended to make the McSurelys' materials available to congressional committees.

Five days after their arrest, and while they were still in jail, the McSurelys filed suit in federal court to have the Kentucky statute declared unconstitutional and to enjoin the threatened prosecution. Because the suit sought to enjoin enforcement of a state statute, a three-judge district court was convened to consider the McSurelys' claims. *See* Act of June 25, 1948, ch. 646, § 1, 62 Stat. 968 (repealed 1976). At a hearing on September 1, the McSurelys' attorney asked the court either to seal the seized material or to place it in the exclusive custody of the U.S. Marshal. Plaintiffs' Exhibit No. 44, *reprinted in* Joint Appendix (J.A.) 1863. Following this request, the attorneys for both sides met with the judges in chambers. There was no record entry as to what took place in

chambers, except as was indicated ten days later in a court order. In that order, the court stated, in relevant part, that "[t]he parties having agreed thereto ... the material, literature and all objects seized herein shall be kept in the custody of ... Thomas B. Ratliff, and that same shall be made available to the United States Marshal ...." Plaintiffs' Exhibit No. 7, *reprinted in* J.A. 1782–83. The court further ordered the U.S. Marshal and Ratliff to make an inventory of the material, and ordered Ratliff to return "such personal articles and property as he does not deem material to the investigation and prosecution herein." *Id.* at 1783. Ratliff prepared the inventory, but never returned any of the property.

Three days later, on September 14, the three-judge court, one judge dissenting, issued an order declaring the Kentucky sedition statute unconstitutional. The final paragraph of that order directed Ratliff to retain custody of the seized material pending appeal of the judgment. That paragraph, referred to throughout these proceedings as the "safekeeping order," stated:

> It is further ordered that all books, papers, documents and other material now in the custody of the Commonwealth Attorney of Pike County, Ratliff, reflected by the Inventory filed in this action continue to be held by him in safe keeping until final disposition of this case by appeal or otherwise.

Plaintiffs' Exhibit No. 9, *reprinted in* J.A. 1796. One month later, the court issued an opinion setting forth its rationale for declaring the sedition statute unconstitutional. The opinion made no mention of the "safekeeping order." *McSurely v. Ratliff,* 282 F.Supp. 848 (E.D.Ky.1967).

The Senate defendants first became involved with the McSurely material sometime in September, over a month after the McSurelys' home was searched. The Subcommittee was conducting a wide-ranging investigation into civil and criminal disorders throughout the country. After being notified by a Washington attorney that Ratliff had information regarding efforts

to organize young people "to engage in violence and demonstrations," Trial Transcript (Tr.) of Dec. 2, 1982, at 79, *reprinted in* J.A. 825, Lavern Duffy, a Subcommittee staff member, contacted Ratliff by telephone on September 25. During that conversation, Duffy (who is not a party to this suit) set up an appointment to come to Kentucky to inspect the documents. The next day, Duffy wrote a memorandum to defendant Adlerman stating that Ratliff "would arrange to have the [ ] records turned over to the subcommittee upon receipt of a subpoena ...." Plaintiffs' Exhibit No. 35, *reprinted in* J.A. 1843.

On October 8, pursuant to directions from Adlerman, defendant Brick, a Subcommittee investigator, went to Kentucky in place of Duffy. Plaintiffs' Exhibit No. 36, *reprinted in* J.A. 1844. Brick inspected the material being held in Ratliff's custody at the Pike County courthouse and took copies of 234 documents back to Washington with him. There is conflicting evidence in the record concerning how Brick ultimately came to possess those particular documents. The jury could have found either that he was given them by one of Ratliff's assistants or that he selected them himself while at the courthouse. Among the documents were numerous personal letters and notes, including a love letter from columnist Drew Pearson to Margaret McSurely that was addressed "Dearest Cucumber."

Upon his return to Washington, Brick conferred with Adlerman and with Senator McClellan, then-chairman of the Subcommittee. Brick showed McClellan only one of the documents—the "Dearest Cucumber" letter. Both McClellan and Adlerman agreed to Brick's suggestion that Brick go back and inspect more of the seized material. On October 12–13, Brick inspected the material in Kentucky and took notes on what he found. He then returned to Washington and prepared subpoenas for Senator McClellan's signature.

On October 18, Brick personally served congressional subpoenas on the McSurelys for numerous documents that had been seized from their home in August. Because the documents were not in the McSurelys' possession, Brick also served subpoenas on Ratliff and the U.S. Marshal. Upon service of the subpoenas, the McSurelys learned, for the first time, that the Subcommittee was interested in their material. They immediately filed a motion in the district court to prevent Ratliff and the U.S. Marshal from complying with the subpoenas.

The McSurelys' effort to block Ratliff and the U.S. Marshal from complying with the subpoenas lasted several months and included two trips to the United States Supreme Court. The history of that litigation is chronicled in more detail in the appendix. The three-judge court ordered Ratliff and the U.S. Marshal to comply with the subpoenas, but the Court of Appeals for the Sixth Circuit reversed and ordered instead that the material be returned to the McSurelys. *McSurely v. Ratliff,* 398 F.2d 817 (6th Cir.1968). The court held that the documents must be returned because the district court's right to retain the material had expired once the time for taking an appeal had elapsed. The court, however, declined to rule on the validity of the subpoenas. It reversed "without prejudice to the right of the Senate Committee to proceed with the enforcement of the subpoenas against Mr. and Mrs. McSurely." *Id.* at 818.

The documents were finally returned to the McSurelys on November 8, 1968, over three months after the Court of Appeals decision. Pursuant to a request by Adlerman, Ratliff arranged to coordinate return of the documents with issuance of new subpoenas on the McSurelys.

Alan McSurely testified as to the manner in which he ultimately received the documents: he stated that Brick handed the 234 copies to him, one by one, and asked him to read through them to verify that the copies were, in fact, identical to the originals. This was the first time the McSurelys learned which documents had been in the Subcommittee's possession. Those documents included the "Dearest Cucumber"

letter and Margaret McSurely's personal diary, neither of which Alan McSurely had seen before. The papers revealed the details of a love affair between Drew Pearson and Margaret McSurely several years earlier, before the McSurelys had met. Alan McSurely learned of that affair for the first time when he read the documents handed to him by Brick. Alan McSurely testified: "Brick got, he kept pushing me to keep on reading this stuff. He would give me these letters and say, 'Make sure they are the same now, read them all the way through.'" Tr. of Nov. 23, 1982, at 107, *reprinted in* J.A. 612.

Once the documents had been returned to the McSurelys, Brick had new subpoenas served on them. That night, after preparing their own inventory of the 234 documents, the McSurelys destroyed the documents without notifying the Subcommittee. After the McSurelys appeared before the Subcommittee on March 4, 1969, and refused to produce the subpoenaed documents, the full Senate approved a resolution authorizing the Justice Department to prosecute the McSurelys for contempt of Congress. S.Res. 191, 91st Cong., 1st Sess. (1969).

Jury verdicts were returned against the McSurelys on the contempt charges, but this court reversed those convictions. *United States v. McSurely*, 473 F.2d 1178 (D.C.Cir.1972). A majority of the panel held that the exclusionary rule barred admission of the subpoenas at trial because they were based on information derived from an unconstitutional search and seizure by the Kentucky officials and by Brick. *Id.* at 1194. Judge Wilkey concurred in the result, but disagreed with the majority's reliance upon the exclusionary rule and its fourth amendment analysis. He would have reversed the convictions on the ground that the government had failed "to establish one of the necessary elements of its case: pertinency of its demands to the valid subject of the legislative inquiry." *Id.* at 1203.

## THE SUIT FOR DAMAGES

### A. *The Initial Proceedings*

The initial complaint in this action was filed on March 4, 1969, the same day the McSurelys appeared before the Subcommittee. The suit was initially brought by the McSurelys and four organizations against all members of the Subcommittee, the Subcommittee's chief counsel, and the Subcommittee's general counsel. The complaint was based on various first and fourth amendment claims. The plaintiffs sought a declaration that the McSurelys did not have to comply with the subpoenas, an injunction to restrain the institution of any criminal proceedings against the McSurelys for failing to comply with the subpoenas, and damages. The district court stayed all proceedings in the suit until thirty days after final resolution of the criminal case against the McSurelys. In the first of three interlocutory appeals in this case, we reversed that order as overbroad and remanded for further proceedings. *McSurely v. McClellan*, 426 F.2d 664 (D.C.Cir.1970) (*McSurely I*).

The district court granted the McSurelys leave to file an amended and supplemental complaint in 1971. *See* R. 33, *reprinted in* J.A. 143. In the amended complaint, the four organizations were dropped as plaintiffs and all Subcommittee members, except for McClellan, were dropped as defendants. The amended complaint added Ratliff and Brick as defendants who, along with Adlerman, McClellan and Donald O'Donnell, chief counsel of the Subcommittee, were sued individually and in their official capacities. The McSurelys dropped their claims for injunctive and declaratory relief but retained their claims for damages. They sought compensatory and punitive damages against each defendant for violation of their constitutional rights under the first, fourth, fifth, and fourteenth amendments. The theory of the case was that the unlawful actions of the defendants, both individually and collectively, resulted in the McSurelys' loss of employment, invasion of privacy, and humiliation and embarrassment.

The Senate defendants filed a motion for summary judgment claiming that the Speech or Debate Clause of the United States Constitution, art. I, § 6, cl. 1, immunized them from liability, but the district court denied their motion. Following the Supreme Court's decision in *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the Senate defendants moved for reconsideration or certification under 28 U.S.C. § 1292(b) of the issue of legislative immunity. After the district court denied this motion, the Senate defendants filed the second interlocutory appeal in this case. The district court stayed all pretrial discovery pending resolution of those claims on appeal.

A divided panel of this court agreed with the Senate defendants that the Speech or Debate Clause immunized them from liability for most of the McSurelys' claims. *McSurely v. McClellan*, 521 F.2d 1024 (D.C.Cir.1975). The full court vacated the panel decision and agreed to rehear the case en banc. The court's en banc decision established the framework for the subsequent trial against the Senate defendants and for the issues raised on this appeal. *McSurely v. McClellan*, 553 F.2d 1277 (D.C.Cir.1976) (en banc) (*McSurely II*)

### B. *The En Banc Opinions*

The ten judges sitting en banc in *McSurely II* agreed on several issues. The court unanimously agreed to dismiss four of the seven claims against the Senate defendants. First, because there was no factual allegation in the amended complaint that the Senate defendants were involved in any way in the raid of the McSurelys' home, the court dismissed all claims based on the initial search and seizure in August 1967. *Id.* at 1288, 1303 n. 2. Second, the full court also agreed that three claims were based on protected legislative conduct and, therefore, had to be dismissed. Those claims involved the inspection of the 234 documents by the Subcommittee staff in Washington, the use of the documents as the basis for issuing the subpoenas, and the use of the documents to procure the

contempt citations against the McSurelys. *Id.* at 1296–98, 1303 n. 2.

The court, however, denied the Senate defendants' motion for summary judgment as to the remaining three claims. The court unanimously agreed that dissemination of the documents *outside* the Congress would not be protected by the doctrine of legislative immunity. *Id.* at 1285–86, 1303. The court was equally divided, however, over whether Brick's inspection of the seized material and transportation of the 234 copies to Washington was protected activity. Because the judges split five-five over the availability of Speech or Debate immunity for Brick's conduct, the district court's denial of the defendants' summary judgment motion was given effect insofar as it pertained to the claims arising from Brick's inspection and transportation of the documents.

With regard to those claims, all ten judges agreed that immunity is not available under the Speech or Debate Clause when illegal means are used to achieve an otherwise legitimate legislative purpose. *Id.* at 1287–88, 1303 n. 3. The issue that divided the court was whether, *under any conceivable set of facts*, the Subcommittee violated the McSurelys' fourth amendment rights. Specifically, the court was divided over the question of whether Brick's inspection and transportation of the documents constituted a violation of the fourth amendment, independent of the initial seizure by Kentucky officials.

### C. *Proceedings Subsequent to the En Banc Rulings*

Following issuance of the en banc opinions, the defendants filed a petition for writ of certiorari which the Supreme Court granted. *McClellan v. McSurely*, 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977). Following briefing and oral argument, however, the writ was dismissed. *McAdams v. McSurely*, 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

On remand a question arose concerning substitution of parties for Brick and Adlerman. Both men had died while the Speech

or Debate appeal was pending in this court. *See McSurely II,* 553 F.2d at 1280 n. 1. In their petition for writ of certiorari, the defendants noted that Brick and Adlerman had died and that their estates had not been probated, but that the assets of those estates had been distributed to their respective widows. The McSurelys subsequently filed a motion with the district court requesting that the widows be substituted as parties defendant in place of their late husbands. Over the government's vigorous objections, the district court granted that motion. The government here appeals from that order, claiming that the widows are not proper parties to this suit and that, in any event, any claims that the McSurelys may have had against the widows have long since abated. (Adlerman's widow died while this case was pending and her estate was named as a party defendant in her place.)

Following the Supreme Court's dismissal of the writ of certiorari, the McSurelys amended their complaint to include, *inter alia,* a claim for violation of their common law right of privacy and a request for reasonable attorneys' fees. R. 341, *reprinted in* J.A. 311. At the close of discovery, Ratliff moved for dismissal or, in the alternative, for summary judgment on grounds of absolute and qualified prosecutorial immunity. The district court denied his motions and, in the third interlocutory appeal taken in this case, we affirmed that denial. *McSurely v. McClellan,* 697 F.2d 309 (D.C.Cir.1982) (per curiam) (*McSurely III*).

The McSurelys' case finally went to trial in the fall of 1982 and lasted for two months. During the course of the trial, the district court entered directed verdicts eliminating the McSurelys' claim against O'Donnell and their claim regarding the defendants' alleged dissemination of documents outside the Subcommittee. The McSurelys have not appealed from those directed verdicts.

The verdict forms submitted to the jury required separate findings of liability against Ratliff, McClellan, Adlerman, and Brick as to each plaintiff under three separate theories: violation of the McSurelys' first amendment rights; violation of the McSurelys' fourth amendment rights; and violation of the McSurelys' common law right to privacy. The jury returned verdicts and assessed damages in favor of the plaintiffs on each count, and awarded the McSurelys approximately $1.6 million in damages, most of it against Ratliff. The total damages assessed against the Senate defendants were approximately $200,000 against McClellan, $84,000 against Adlerman, and $105,000 against Brick. All four defendants appealed. Following the settlement agreement, however, *see supra* p. 91, we dismissed Ratliff's appeal.

### D. *Issues on Appeal*

Defendants have raised numerous issues on appeal. Those not discussed in this opinion have been considered by the court and rejected. We also have rejected the defendants' request to reconsider the legal issues resolved by the en banc court in 1976. Although the opinions of an equally divided court may not be cited for precedential value in this circuit, Judge Leventhal's opinion for the prevailing judges constitutes law of the case. His opinion was considered to be the "majority" opinion for the court and, significantly, it established the framework for the conduct of the trial. We refuse to remand now on the basis of a new theory of Speech or Debate immunity or fourth amendment law, for "[a]s matters wend closer to final disposition, stability takes on increased importance." 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 792 (1981).

Our opinion is divided into four parts. In Part I, we hold that party substitution was properly effected in this case. In the remaining sections, we deal with each of the substantive claims against the defendants. In Part II, we hold that, because the state of the law was unclear at the time in question, the doctrine of qualified immunity enunciated in *Harlow v. Fitzgerald,* 457

U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), requires dismissal of the McSurelys' fourth amendment claims. In Part III, we hold that there is insufficient evidence—admissible within the limitations imposed by the Speech or Debate Clause—to support the jury verdicts against the Senate defendants on the first amendment claims. In Part IV, we hold that there was sufficient evidence to support a finding that Brick unlawfully interfered with Alan McSurely's and Margaret McSurely's right to privacy under established common law precedents, but that there was insufficient evidence to connect Adlerman and McClellan to Brick's conduct. We also conclude that no immunity doctrine bars the verdict against Brick.

PART I: *Substitution of Parties*

The Senate defendants preliminarily contend that the district court should have dismissed the McSurelys' claims against Brick and Adlerman "because plaintiffs did not seasonably effect substitutions of 'proper parties' after Brick's and Adlerman's deaths," as required by FED.R.CIV.P. 25(a)(1).[1] Brief for the Senate Appellants at 65 (section heading).[2] The district court, relying on our decision in *Rende v. Kay,* 415 F.2d 983 (D.C.Cir.1969), granted the McSurelys' motion to substitute parties and rejected the Senate defendants' request to dismiss plaintiffs' claims for failure to comply with Rule 25(a)(1). *McSurely v. Mc-Adams,* No. 516–69 (D.D.C. Jan. 17, 1979) ("Memorandum and Order"), *reprinted in* J.A. 209. We affirm this aspect of the district court's decision.

Defendant Brick died on October 15, 1973; defendant Adlerman, on October 1, 1975. Each had named his surviving spouse executor of his estate and provided for her to receive all his assets. The Brick and Adlerman wills were not probated, however. Therefore, neither widow was ever designated "legal representative" of her husband's estate. *See* J.A. 207–08 (affidavits of Mary Brick and Evelyn Adlerman).

Rule 25(a)(1) of the Federal Rules of Civil Procedure governs substitution of parties on death; it reads:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

Appellants assert that the McSurelys did not satisfy Rule 25(a)(1)'s terms in two principal respects: they contend that the substitution motion was untimely and that the parties substituted—decedents' widows—were improper because they were not "legal representatives." Neither contention has merit.[3]

---

**1.** The text of Rule 25(a)(1) is set out *infra* p. 97.

**2.** Senator McClellan also died during the pendency of this case. His death occurred after the Senate defendants filed their certiorari petition, however, and they substituted a proper party in his place pursuant to Supreme Court rule. *See* Brief for the Senate Appellants at 65 n. 47. Thus, appellants' Rule 25(a)(1) contention pertains only to Brick and Adlerman. We note that Rule 25(a)(1) permits the successors or representatives of any deceased party to effect substitution without awaiting a motion by the adverse party.

**3.** Appellants conceded, in response to this court's December 4, 1974, inquiry, that the McSurelys' claim against Brick (and presumably Adlerman as well) survived his death and was maintainable against representatives of his estate. *See McSurely II,* 553 F.2d at 1280 n. 1. Appellants withdrew the concession on remand, but the district court rejected their survivability contention on the merits. *See* Memorandum and Order, *reprinted in* J.A. 209. On return to this court, appellants do not press the claim survival issue with any vigor, *see* Brief for the Senate Appellants at 65 & n. 46, and we find no

We turn first to the timeliness question. The deaths of Brick and Adlerman were noted for the first time in litigation papers submitted in this case in the *McSurely II* petition for certiorari, filed May 20, 1977. The reference to the deaths made in the certiorari petition, however, did not identify the decedents' "successors" or "representatives." By letter dated July 29, 1977, the McSurelys asked the Department of Justice for the surviving widows' "whereabouts". *See* Letter from Morton Stavis to Daniel M. Friedman, Acting Solicitor General (July 29, 1977), *reprinted in* J.A. 194. On August 17, 1977, after the plaintiffs moved for an order directing disclosure, appellants supplied the requested information. *See* J.A. 191–200. Within two weeks thereafter, the McSurelys moved, successfully, to substitute widows Mary Brick and Evelyn Adlerman as parties defendant. *See* Motion for Substitution (Aug. 30, 1977), *reprinted in* J.A. 201.[4]

*Rende v. Kay,* 415 F.2d 983 (D.C. Cir.1969), as the district court recognized, instructs that a suggestion of death does not set in motion Rule 25(a)(1)'s ninety-day limitation unless the suggestion "identif[ies] the representative or successor ... who may be substituted as a party." 415 F.2d at 986. It would hardly be consistent with "the just, speedy, and inexpensive determination" of civil actions, FED.R.CIV.P. 1, *Rende v. Kay* makes plain, "to place upon the plaintiff the burden of locating the representative of the estate within 90 days." 415 F.2d at 986; *accord Al-Jundi v. Rockefeller,* 88 F.R.D. 244, 247 (W.D.N.Y.1980). Appellants' argument that the May 20, 1977, petition for certiorari, although it did not identify any "representative" or "successor" plaintiffs could substitute, nonetheless started the running of

Rule 25(a)(1)'s ninety-day time period, is impossible to reconcile with *Rende v. Kay.* We follow that pathmarking precedent, and accordingly hold that no time ran against the McSurelys under Rule 25(a)(1) before August 17; their August 30 motion, therefore, was well within the Rule's time frame.[5]

Nor is there greater weight in appellants' alternative objection, their claim that the widows of Brick and Adlerman could not be "proper parties" within the meaning of Rule 25(a)(1) because no court with "jurisdiction over the decedent's estate" had ever named them the deceased party's "legal representative." Brief for the Senate Appellants at 67. This argument too is incompatible with our *Rende v. Kay* decision. In essence, appellants say that no "proper party" could exist to be substituted for Brick and Adlerman unless the McSurelys themselves assumed the burden of qualifying such a party. *Id.* at 68. This the McSurelys could have done, appellants maintain, by "secur[ing] the appointment of representatives *ad litem* for the estates of Brick and Adlerman." *Id.* at 69. But in *Rende v. Kay,* we stated that compelling a plaintiff to "institut[e] machinery in order to produce some representative of the estate ad litem" would contravene the purpose of amended Rule 25(a)(1) "to dispel unwarranted rigidity and allow more flexibility in substitution." 415 F.2d at 986.

Appellants, in short, urge an inequitable application of Rule 25(a)(1) that finds no support in the rulemakers' design. *See, e.g., Boggs v. Dravo Corp.,* 532 F.2d 897, 900 (3d Cir.1976) (purpose of the 1963 amendments to Rule 25(a)(1) was "to liber-

---

warrant for disturbing the district court's disposition of it.

4. Evelyn Alderman died on June 22, 1980. The district court thereafter substituted representatives of her estate as parties defendant. *See McSurely v. McAdams,* No. 78–1916 (D.D.C. Sept. 8, 1980) (Memorandum and Order granting motion for substitution), *reprinted in* J.A. 216.

5. The 90-day limitation, we note, may be subject to extensions or exemptions when good cause is shown therefor and the party opposing substitution has not been prejudiced by the delay. *See, e.g., Staggers v. Otto Gerdau Co.,* 359 F.2d 292, 296 (2d Cir.1966); *Al-Jundi v. Rockefeller,* 88 F.R.D. 244, 247 (W.D.N.Y.1980); *Yonofsky v. Wernick,* 362 F.Supp. 1005, 1014–15 (S.D.N.Y. 1973).

alize the Rule and to allow flexibility in substitution of parties"); *Kilgo v. Bowman Transportation, Inc.,* 87 F.R.D. 26, 27 (N.D.Ga.1980) (same); *National Equipment Rental, Ltd. v. Whitecraft Unlimited, Inc.,* 75 F.R.D. 507, 509 (E.D.N.Y.1977) (same). Several courts, including our own, have stated that the distributee of a distributed estate is a "proper party" for substitution under Rule 25(a)(1). *See, e.g., Rende v. Kay,* 415 F.2d at 985; *Ashley v. Illinois Central Gulf Railroad Co.,* 98 F.R.D. 722, 724 (S.D.Miss.1983); *cf. Kilgo v. Bowman Transportation, Inc.,* 87 F.R.D. 26, 27 (N.D.Ga.1980) (person named as executor in plaintiff's will, but who does not become executor because he elects statutory share rather than probating will, is a substitutable "proper party").[6] Sensibly construing Rule 25(a)(1), we hold that Mary Brick and Evelyn Adlerman were "proper parties" for the McSurelys to substitute.

PART II: *Fourth Amendment Claims*

■ In 1976, in *McSurely II,* this court, sitting en banc, divided evenly (five-five) on the question whether, under any conceivable set of facts, the Senate defendants could be found to have violated the McSurelys' fourth amendment rights. The even division resulted in a remand for trial. The trial of the fourth amendment claims yielded jury verdicts in favor of the McSurelys against all three Senate defendants.[7] Guided by the Supreme Court's 1982 restatement of the qualified immunity defense sheltering government officials from civil liability, *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), we overturn those verdicts and direct dismissal of the claims.

Judge Leventhal's *McSurely II* opinion, representing the views of five members of this court, declared that a congressional investigation utilizing means prohibited by the fourth amendment warrants no Speech or Debate Clause protection. *See* 553 F.2d at 1287–88. In holding that the McSurelys' fourth amendment claims were subject to further proceedings, Judge Leventhal stated that the record afforded "more than merely colorable substance" to the McSurelys' charge that Brick "did indeed violate the Fourth Amendment by his inspection and transportation back to Washington of documents that were under a court-imposed 'safekeeping order.'" *Id.* at 1289. Furthermore, Judge Leventhal said that the McSurelys had made a prima facie showing that Brick's investigative activity violated the three-judge court's safekeeping order. *Id.* at 1291.

On the other hand, Judge Wilkey's opinion, representing the views of five different members of the court, stated that Brick's actions "could never, on all logic and precedent, be held an 'unreasonable search and seizure' within the [meaning of the] Fourth Amendment." *Id.* at 1305 (Wilkey, J., dissenting). Judge Wilkey preliminarily attempted, in great detail, to demonstrate that Brick's conduct did not violate the three-judge court's safekeeping order. *See id.* at 1310–15. But even a violation of the safekeeping order, in Judge Wilkey's view, at most would have rendered Brick subject to a contempt of court citation; under Judge Wilkey's analysis, the asserted violation would not have exposed Brick to liability in damages for a fourth amendment violation. *Id.* at 1311 n. 41. Judge Wilkey questioned most insistently "how the in-

---

**6.** Appellants cite *Mallonee v. Fahey,* 200 F.2d 918, 919 (9th Cir.1952) (Douglas, Circuit Justice) as support for their claim that a "proper party" under Rule 25(a)(1) must be a decedent's "legal representative." Brief for the Senate Appellants at 67. That decision, however, held only that Rule 25(a)(1) requires substitution of a "legal representative" *as opposed to a mere "successor[ ] in office,"* 200 F.2d at 919 (emphasis added); the court was not attempting any distinction between legal representatives and distributees of unprobated estates.

**7.** Recovery from the Senate defendants on fourth amendment grounds was premised on the charge that Brick violated the three-judge court's safekeeping order by inspecting, selecting, and retrieving 234 xerox copies of documents seized in the August 11, 1967, raid of the McSurely home and held by Ratliff.

The jury awards against all defendants for fourth amendment violations were as follows:

| | Ratliff | McClellan | Adlerman | Brick |
|---|---|---|---|---|
| Alan McSurely | $61,720 | $39,280 | $19,846 | $23,320 |
| Margaret McSurely | $51,280 | $53,360 | $14,000 | $18,800 |

spection by one authorized government agent of documents in the custody of another can be characterized as an unconstitutional search." *Id.* at 1318–19; *accord id.* at 1316–17, 1321–24.

Six years after our *McSurely II* en banc opinions, the Supreme Court restated the standard governing public officials' qualified "good faith" immunity from civil damages actions:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted); *see also Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). By barring claims that do not involve "clearly established" statutory or constitutional rights, even if the defendant official acted with malice, *see* 457 U.S. at 817–18, 102 S.Ct. at 2738, *Harlow* substantially broadened the qualified immunity defense.

It is irrelevant at this juncture that Judge Leventhal's opinion for five members of the court in *McSurely II* qualifies as law of the case (albeit not law of the circuit) on whether the Senate defendants independently violated the McSurelys' fourth amendment rights. The inquiry *Harlow* makes critical is whether in 1967, at the time Brick inspected the documents and transported them to Washington, D.C., one could fairly describe that conduct as trespassing on a "clearly established" constitutional right. The answer must be "No" when, nine years later, in 1976, five members of this court thought it manifest that the Senate defendants' investigative activity remained wholly within the law.

It would be flatly inconsistent with *Harlow* to strip away the Senate defendants' immunity in this case simply because "[they were] not more perceptive of constitutional principles ... than [five] federal judges of this Circuit." *Ward v. Johnson,* 690 F.2d 1098, 1112 (4th Cir.1982) (en banc). Public officials, *Harlow* and *Davis* underline, "must not be held to act at [their] peril" when maneuvering in legal realms governed by rules "that even learned and experienced jurists have had difficulty in defining." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir. 1972) (on remand); *accord id.* at 1349 (Lumbard, J., concurring) ("[F]ederal officers cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves.").[8]

In a desperate effort to preserve their fourth amendment jury verdicts, the McSurelys identify purportedly *"serious differences"* between the record now and that available at the time of the 1976 decision," Brief for Appellees at 87 (emphasis added); they suggest that Judge Wilkey and his colleagues, if confronted with the trial record, would not have rejected the fourth amendment claims. The suggestion does not withstand close inspection.[9]

> Central to that holding was the confusion evident in the en banc decision—confusion indicating "that the Court [had not been] confronted with a simple issue automatically controlled by earlier decisions." *Id.* at 169 (quoting appellee Mitchell's brief).

---

**8.** Our recent decision in *Zweibon v. Mitchell,* 720 F.2d 162 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984), reinforces the Senate defendants' claim to qualified immunity. In *Zweibon,* this court, after several preliminary rounds, affirmed the dismissal, on qualified immunity grounds, of a civil action for damages against a former Attorney General alleging electronic surveillance conducted in violation of the fourth amendment. Our initial foray into the case produced six separate opinions, all finding the Attorney General's actions illegal, but disagreeing on the rationale. Our latest *Zweibon* decision ruled the former Attorney General entitled to summary judgment on the issue of qualified immunity.

**9.** We note that the McSurelys fail, initially, to explain how additional *factual* evidence adduced at trial could alter Judge Wilkey's conclusion *"as a matter of law* that [Brick's] inspection and copying [of the McSurelys' documents] did not violate the custody order." 553 F.2d at 1304 (emphasis added). Nor do appellees demonstrate how their latest additions to the record,

The McSurelys first emphasize the deposition testimony of Judge Moynahan (one of the members of the three-judge court convened to consider the McSurelys' constitutional attack upon Kentucky's sedition statute). They claim the judge's testimony renders "very doubtful" "Ratliff's version" of events "upon which the dissenters relied," *id.;* according to that version, Ratliff contacted Judge Moynahan before affording Brick access to the documents, and the judge gave Ratliff permission to make the papers available to Brick. But Judge Wilkey twice stated that his interpretation of the safekeeping order did not depend upon the Moynahan-Ratliff interchange. *See* 553 F.2d at 1308 n. 27, 1312. We note, furthermore, that Judge Moynahan's *trial* testimony did not contradict Ratliff's view of the timing of their conversation. *See* Tr. of Dec. 10, 1982, at 141, *reprinted in* J.A. 1099.

The McSurelys next contend that the en banc dissenters would have altered their construction of the September 14 safekeeping order in light of Judge Combs' trial testimony. Judge Combs (another member of the three-judge court), the McSurelys insist, refused to express an opinion as to whether the safekeeping order required Ratliff at least to notify the McSurelys before permitting third party access to their papers. *See* Brief for Appellees at 87 (referring to Tr. of Dec. 10, 1982, at 104, *reprinted in* J.A. 1087). Judge Combs' hesitancy in this regard is significant, the McSurelys suggest, because it undercuts Judge Wilkey's reliance on the three-judge court's October 30 and December 13, 1967, rulings that the safekeeping order did not inhibit Senate Subcommittee access to the McSurely materials.[10]

A complete reading of Judge Combs' testimony, however, reinforces the *McSurely II* dissenters' view that the safekeeping order permitted Brick's examination and copying of the McSurely documents. Judge Combs repeatedly stated at trial his view that "the [safekeeping] order would permit and did permit the Commonwealth's Attorney to permit an authorized agent of the Senate [sic] Subcommittee to look at these documents, and to make copies of them." Tr. of Dec. 10, 1982, at 102, *reprinted in* J.A. 1085; *accord id.* at 49, 51–52, 55–56, 85, *partially reprinted in* J.A. 1065, 1067–68, 1071–72. He said specifically that he would have ruled Ratliff in contempt had any violation of the safekeeping order occurred. *Id.* at 107, *reprinted in* J.A. 1089. Judge Moynahan's testimony further confirmed the *McSurely II* dissenters' interpretation of the three-judge court's order. *See id.* at 139–40, 171, *reprinted in* J.A. 1097–98, 1111. Indeed, he stated unequivocally that, as he read the safekeeping order, it did not entitle the McSurelys even to notice prior to third party inspection of the documents in Ratliff's possession. *See id.* at 174–76, *reprinted in* J.A. 1114–16.

The McSurelys also contend that "the dissenters [did not] have the benefit of the September 1, 1967 transcript ... explaining the origin of the orders of September 11 and 14, 1967." Brief for Appellees at 88. Since they stipulated to the September 11 order only after expressing concern about widespread distribution of their personal papers, the McSurelys argue, "it could hardly be presumed that [they] were *agreeing* to an order which authorized exactly what they were seeking to prevent." *Id.* at 50 (emphasis in original). This is unconvincing argument.

The McSurelys plainly requested a *sealing* order at the September 1 hearing, *see* Plaintiffs' Exhibit No. 44, at 87, *reprinted in* J.A. 1863; they did not receive one. The three-judge court knew the difference be-

---

principally relating to the meaning of the three-judge court's safekeeping order, would affect the conclusions of Judge Wilkey and his colleagues, who contemplated no fourth amendment transgression even if they could agree that there had been a violation of the three-judge court's command. *See id.* at 1311 n. 41.

**10.** The McSurelys sought at trial to establish a difference between subpoenaed access, challengeable in court, and informal, *ex parte* access, unchallengeable because unknowable. *See* Tr. of Jan. 3, 1983, at 39–42 (closing argument).

tween a sealing and a safekeeping order. *See* Tr. of Dec. 10, 1982, at 47, 50–51, 55, *reprinted in* J.A. 1063, 1066–67, 1071 (Judge Combs' testimony); *id.* at 140, 171, *reprinted in* J.A. 1098, 1111 (Judge Moynahan's testimony). The September 11 order agreed to by all parties gave the McSurelys less protection than they desired, but more than they would have had without any order in place. Litigants not uncommonly settle for something in between where they are and where they would like to be.[11]

In sum, we hold only that public officials performing discretionary functions need not be "more perceptive of constitutional principles" than half the judges of this circuit. The Senate defendants did not violate any "clearly established" fourth amendment rights and thus are immune from civil liability for their investigative activity. We reverse the district court's judgment against the Senate defendants on the fourth amendment claims, and order those aspects of the McSurelys' complaint dismissed.

PART III: *First Amendment Claims*

■ The McSurelys' first amendment claims against the Senate defendants, as stated in the complaint, rested on allegations that these defendants "[u]se[d] the instrumentality of the Subcommittee investigation" "to harass, intimidate and stigmatize the plaintiffs in order to prevent plaintiffs from continuing their political, poverty and civil rights activity in Eastern Kentucky." Amended and Supplemental Complaint at 6 (Nos. 18(a), (c)) (Sept. 7, 1971), *reprinted in* J.A. 148; *accord id.* at 11 (No. 28(b)(i)), *reprinted in* J.A. 153; Complaint at 12–13 (No. 34), 13–14 (No. 35), 17 (No. 37(i)) (Mar. 4, 1969), *reprinted in* J.A. 66–67, 67–68, 71. The jury returned verdicts for the McSurelys against both Ratliff and the Senate defendants on the first amendment claims.[12] For two reasons, each independently sufficient, we overturn the verdicts against the Senate defendants and direct dismissal of the McSurelys' first amendment claims against them. First, review of the record reveals that the McSurelys failed to prove the first amendment contentions their complaint put forward regarding the Senate defendants. Second, even if the evidence had borne out those contentions, the Speech or Debate Clause[13] would preclude recovery.

Plaintiffs' original and amended complaints plainly charge the Senate defendants with conduct outlawed by the first amendment. *See, e.g., Hobson v. Wilson,* 737 F.2d 1, 27 (D.C.Cir.1984) ("[I]t is *never* permissible [under the first amendment for Government] to impede or deter lawful civil rights/political organization, expression or protest with no other direct purpose and no other immediate objective than to counter the influence of the target associations.") (emphasis in original); *id.* at 29. Plaintiffs' proof at trial, however, did not bear out the McSurelys' allegations that the Senate defendants acted, as the McSurelys claimed Ratliff did, to chill plaintiffs' expression, organizational endeavors, or associations. Instead, the evidence plaintiffs introduced concerning the Senate defendants tended to

---

**11.** We find insignificant the other allegedly "serious differences" between the post-trial and 1976 records highlighted by the McSurleys. For example, the McSurleys point to trial testimony contradicting Judge Wilkey's statement that Brick "played no part" in the selection of documents he transported from Pikeville to Washington, D.C. *See* Brief for Appellees at 88 (quoting 553 F.2d at 1328). Judge Wilkey, however, mentioned Brick's role as document selector only in his discussion of plaintiffs' privacy claim. *See* 553 F.2d at 1326 (section introduction).

**12.** Recovery from Ratliff on first amendment grounds was premised on the charge that he "acted for the unlawful purpose of disrupting and intimidating [plaintiffs] in the exercise of their freedom of speech and association when he allegedly planned and arranged for an unlawful search of their home, and the arrest of their person." Tr. of Jan. 5, 1983, at 35, *reprinted in* J.A. 1699 (jury instructions).

The jury awards for first amendment violations were as follows:

| | Ratliff | McClellan | Adlerman | Brick |
|---|---|---|---|---|
| Alan McSurely | $61,720 | $39,280 | $19,846 | $23,320 |
| Margaret McSurely | $51,280 | $53,360 | $14,000 | $18,800 |

**13.** The text of the Speech or Debate Clause is set out *infra* note 16.

show that Senator McClellan's interest in investigating the McSurelys related to a *private feud* McClellan had with newspaper columnist Drew Pearson; the McSurelys produced no evidence suggesting that the real purpose of the Subcommittee investigation was curtailment of their political activities.

Plaintiffs introduced considerable evidence indicating that Commonwealth Attorney Ratliff's August 11, 1967, arrest of the McSurelys, his search of their home, his seizure of their books and papers, and his attempt to prosecute them under Kentucky's sedition statute, stemmed from Ratliff's opposition to the McSurelys' political activities and his wish to drive them out of Pikeville. *See, e.g.,* Plaintiffs' Exhibit No. 26 at 2–3, *reprinted in* J.A. 2081–82; Plaintiffs' Exhibit No. 56 at 3, *reprinted in* J.A. 2090; Tr. of Nov. 23, 1982, at 161, *reprinted in* J.A. 547; Tr. of Nov. 30, 1982, at 80–81, *reprinted in* J.A. at 741–42; Tr. of Dec. 6, 1982, at 98, *reprinted in* J.A. 974; *cf. McSurely v. Ratliff,* 282 F.Supp. 848, 852 (E.D.Ky.1967) (three-judge court) ("[T]he conclusion is inescapable that the criminal prosecutions were instituted, at least in part, in order to stop plaintiffs' organizing activities in Pike County."). The McSurelys have not, however, alleged any involvement by the Senate defendants in the August 11, 1967, ransacking of the McSurely home or in Ratliff's subsequent attempt to prosecute plaintiffs. *See McSurely II,* 553 F.2d at 1299; Tr. of Jan. 5, 1983, at 38–39, *reprinted in* J.A. 1702–03 (jury instructions); *id.* at 105, *reprinted in* J.A. 1744 (same); Tr. of Jan. 6, 1983, at 10–11, *reprinted in* J.A. 1747–48 (same). Thus, evidence suggesting that Ratliff violated the McSurelys' first amendment rights provides no support for the jury's first amendment verdicts against the Senate defendants.

Plaintiffs did seek to demonstrate at trial an improper motive for the Subcommittee's investigation of the McSurelys. The McSurelys presented evidence of a long time feud between Senator McClellan and newspaper columnist Drew Pearson. *See* Tr. of Dec. 3, 1982, at 37–62, *partially reprinted in* J.A. 910–33 (Margaret McSurely's testimony and court-counsel colloquy); *id.* at 119–20 (Margaret McSurely's testimony); Tr. of Dec. 6, 1982, at 27–29, *reprinted in* J.A. 968–70 (Jack Anderson's testimony); *see also* Plaintiffs' Response to Senate Defendants' Motion for Judgment Notwithstanding the Verdict at 32–33 (Feb. 8, 1983). Senator McClellan's principal objective in investigating the McSurelys, plaintiffs contended at trial, was to discover intimate correspondence between Drew Pearson and Margaret McSurely which could be used to embarrass, indeed to blackmail, Pearson. *See, e.g.,* Tr. of Jan. 3, 1983, at 48–50 (closing argument); *see also* Amended and Supplemental Complaint at 12 (No. 28(b)(ii)), *reprinted in* J.A. 154.[14]

We need not determine whether plaintiffs presented sufficient evidence to substantiate their blackmail contention or whether the Speech or Debate Clause permits this sort of motive-based inquiry.[15] It suffices for the purpose at hand to point out that the McSurelys' proof concerning an illicit investigatory motive on Senator McClellan's part—his alleged wish to embarrass or blackmail Drew Pearson—is irrelevant to the plaintiffs' charge, as tendered in their complaint, of first amendment violations by the Senate defendants. The McSurelys' complaint-tendered first amendment claims against the Senate defendants, we repeat, rested on allegations that the Subcommittee's purpose in investigating plaintiffs was to harass and stigmatize them to deter their political activities. The evidence of Senate defendant motivation presented by the McSurelys at trial, however, was unrelated to that charge. *Cf. United States v. Ross,* 719 F.2d 615,

14. On the Drew Pearson-Margaret McSurely relationship, see, *e.g.,* Tr. of Dec. 2, 1982, at 143–46, 150–52, *reprinted in* J.A. 846–49, 853–55 (Margaret McSurely's testimony).

15. For discussion of the limitations the Speech or Debate Clause places on a first amendment motive-based inquiry, see *infra* p. 106.

620 (2d Cir.1983) (allegation that plaintiff's criminal prosecution was partially motivated by his refusal to become a government informant states no constitutional claim because "selection was [not] based on grounds generally forbidden to government such as race, religion, or the exercise of a constitutionally protected right"); *see also* Tr. of Dec. 29, 1982, at 232, *reprinted in* J.A. 1645 (concession by McSurelys' counsel that seizure of McSurelys' *private* papers does not violate first amendment).

The mismatch between the first amendment claims plaintiffs pleaded against the Senate defendants and the proof offered at trial resulted in confused discussion between counsel and court concerning proposed jury instructions. The Senate defendants consistently and emphatically objected to any proposed first amendment jury instruction implicating them; they maintained repeatedly that "there is no evidence in the record that the Senate Defendants did anything in any way to involve or infringe upon the McSurelys' First Amendment rights." Tr. of Dec. 29, 1982, at 230, *reprinted in* J.A. 1643; *accord id.* at 231, *reprinted in* J.A. 1644; Tr. of Jan. 5, 1983, at 73; Tr. of Jan. 6, 1983, at 18, *reprinted in* J.A. 2073.

The district court, several times, signalled agreement with the Senate defendants. At one point, the court stated it saw "some basis" in the Senate defendants' contention that Ratliff's first amendment violation was a fait accompli by the time "they [the Senate defendants] came into the picture," Tr. of Dec. 29, 1982, at 232, *reprinted in* J.A. 1645; the court, at that time, declined "to give [the first amendment] instruction as to the Senate Defendants." *Id.* Later, when the Senate defendants objected to a proposed instruction that "lump[ed] all of the defendants together," the district judge remarked that "of course, there is no First Amendment claim against some defendants." Tr. of Jan. 3, 1983, at 177–78. The following day the court indicated it intended to give a first amendment instruction regarding Ratliff only, and not the Senate defendants. Tr. of Jan. 4, 1983, at 82, *reprinted in* J.A. 1675. Subsequent-

ly, *plaintiffs'* counsel, in response to a question from the bench, stated his belief that plaintiffs' first amendment allegations applied only to Ratliff, Tr. of Jan. 5, 1983, at 14, *reprinted in* J.A. 1679; he quickly recanted, however. *Id.* at 15, *reprinted in* J.A. 1680.

The court's jury instructions on the status of plaintiffs' first amendment claims against the Senate defendants were far from clear. The initial first amendment charge referred clearly to Ratliff, not others, *see* Tr. of Jan. 5, 1983, at 35, *reprinted in* J.A. 1699; that charge was followed by fourth amendment instructions unequivocally including both Ratliff and the Senate defendants. *See id.* at 35–39, *reprinted in* J.A. 1699–1703. No instructions delivered before the jury began deliberations explicitly mentioned any first amendment claim against the Senate defendants.

When the jury requested clarification of the standards applicable in determining a first amendment violation, the district court again described the first amendment branch of the case as pertinent to Ratliff alone. *See* Tr. of Jan. 5, 1983, at 102. And again, the court followed up first amendment instructions spotlighting Ratliff with fourth amendment instructions encompassing both Ratliff and the Senate defendants. *See id.* at 102–06, *partially reprinted in* J.A. 1744–45. When the court reminded the jury that plaintiffs made "separate and distinct claims against the Senate defendants," it discussed only the fourth amendment aspect of the case. *Id.* at 115–16.

Only one instruction even arguably connected the Senate defendants with plaintiffs' charges of first amendment violations. On January 6, 1983, in response to a jury request, the court read aloud the portions of the first amendment relevant to the McSurelys' claims. Four paragraphs later, the Court instructed:

> Plaintiff's [sic] do claim ... that the activities between Ratliff and [Brick] and the other Senate defendants insofar as they affected their private papers which were in Ratliff's custody after August

11, 1967, do constitute violations of their rights under *the amendment.*

Tr. of Jan. 6, 1983, at 11, *reprinted in* J.A. 1748 (emphasis added). The Senate defendants objected to this ambiguous instruction. *Id.* at 12–14, *partially reprinted in* J.A. 2069. On two prior occasions the court had delivered the identical instruction; at those times, it expressly referred to the "fourth" amendment. *See* Tr. of Jan. 5, 1983, at 39, 105–06, *reprinted in* J.A. 1703, 1744–45. Acknowledging that plaintiffs' first amendment claim against the Senate defendants was less "clearly delineated" than their fourth amendment theory, the district judge nonetheless determined that the jury should consider the first amendment theory of liability. Tr. of Jan. 6, 1983, at 19, *reprinted in* J.A. 2074.

We do not cite the confusing instructions and counsel-court colloquies relating to the first amendment as indicators of the Senate defendants' entitlement to a new trial. Rather, we point them out as illustrative of the fog generated at trial concerning the nature of plaintiffs' first amendment case against the Senate defendants. The root problem, more readily perceived with the entire record at hand for close review, is that plaintiffs set out on one track, then switched to another. With the first amendment in mind, they asserted in their pleadings that the Senate defendants sought to silence their political expression. When trial time came, they attempted to prove something else—Senator McClellan's interest in pursuing a private feud with a newspaper columnist. The proof adduced, however, was unrelated to the first amendment theory of their pleading and did not support any recovery for the constitutional violations alleged in their complaint.

But even if plaintiffs had proved the first amendment claims their complaint stated against the Senate defendants, they could not have gained relief; the Speech or Debate Clause [16] would bar the way. That separation of powers safeguard "secure[s] against executive or judicial interference the processes of the nation's elected representatives leading up to the formulation of legislative policy and the enactment of laws." *Walker v. Jones,* 733 F.2d 923, 928 (D.C.Cir.1984) (citation omitted), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). The Clause, as interpreted in court decisions, extends absolute immunity to members of Congress for "voting, conduct at committee hearings, preparation of committee reports, authorization of committee publications and their internal distribution, and issuance of subpoenas concerning a subject 'on which "legislation could be had".'" *McSurely II,* 553 F.2d at 1284–85 (footnotes omitted) (quoting *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 506, 95 S.Ct. 1813, 1823, 44 L.Ed.2d 324 (1975)). It is specifically the law of this case, established by our 1976 en banc decision, that Speech or Debate Clause immunity shelters "field investigations by a Senator or his staff." *McSurely II,* 553 F.2d at 1286.

Senator McClellan's Subcommittee unquestionably had authority to investigate the causes of civil and criminal disorder throughout the country in general and the McSurelys' involvement in the 1967 Nashville riots in particular. *See id.* at 1287; [17] *cf. Eastland,* 421 U.S. at 506, 95 S.Ct. at 1823 ("The propriety of making [plaintiff] a subject of the investigation ... is a subject

---

**16.** The Clause provides:
 The Senators and Representatives shall ... for any Speech or Debate in either House ... not be questioned in any other Place.
 U.S.Const. art. I, § 6, cl. 1.

**17.** The en banc court explained:
 The Senate Resolution of August 11, 1967 authorized an investigation into the causes of civil and criminal disorder that were racking the nation during this period. And there was reason for investigative focus on the McSure-

lys. A riot had occurred on April 8–9, 1967, in Nashville, Tennessee. The McSurelys have stipulated that they attended a meeting of the Southern Conference Educational Fund in Nashville immediately before the April, 1967, riot. Commonwealth Attorney Ratliff advised Brick in Pikeville on October 8 that some of the materials seized from the McSurelys' home contained reference to that meeting. *McSurely II,* 553 F.2d at 1287 (footnotes omitted).

on which the scope of our inquiry is narrow.") (citations omitted). Court review, it is true, encompasses "the *manner and methods* [by which a congressional committee] obtain[s] certain information." *United States v. Dowdy,* 479 F.2d 213, 225 n. 20 (4th Cir.) (emphasis added), *cert. denied,* 414 U.S. 823, 866, 94 S.Ct. 124, 132, 38 L.Ed.2d 56, 118 (1973); *see McSurely II,* 553 F.2d at 1287 ("[A] Member of Congress or congressional employee is not free to use every conceivable *means* to obtain investigatory materials, without fear of criminal prosecution or civil suit.") (emphasis added). But plaintiffs' first amendment complaint here heads into tightly protected territory.

█ The McSurelys contend that the Subcommittee's investigation of them was not *"bona fide"*; the Subcommittee, the McSurelys allege, was merely "using the instrumentality of an investigation to harass those whose views [were] at variance with views of the members of the Senate Subcommittee." Complaint at 17 (No. 37(i)), *reprinted in* J.A. 71. Allegations of improperly motivated legislative action, however, are "precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry." *United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966); *see also Eastland,* 421 U.S. at 508–09, 95 S.Ct. at 1824; *Gravel v. United States,* 408 U.S. 606, 629, 92 S.Ct. 2614, 2629, 33 L.Ed.2d 583 (1972); *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). Once a court determines, as we have, that a congressional committee was *"apparently"* performing a legitimate investigative function, the court may not press on and inquire into "the propriety and the motivation for the action taken." *United States v. Dowdy,* 479 F.2d at 226 (emphasis in original). A "claim of an unworthy purpose," in short, "does not destroy the privilege." *Tenney,* 341 U.S. at

377, 71 S.Ct. at 788; *accord Eastland,* 421 U.S. at 508, 95 S.Ct. at 1824.

Two Supreme Court precedents plainly indicate Speech or Debate Clause coverage of the claims plaintiffs stated (but failed to prove) against the Senate defendants: *Tenney, supra* and *Eastland, supra.* In *Tenney,* plaintiff sued members of a state legislative committee,[18] alleging they had deprived him of constitutional rights by summoning him to appear at a hearing convened, not for any legislative purpose, but rather to intimidate him and deter his exercise of first amendment rights. 341 U.S. at 370–71, 71 S.Ct. at 785. The Court ordered the complaint dismissed; judicial examination of the committee's motives for questioning plaintiff, the Court declared, was not "consonant with our scheme of government." *Id.* at 377, 71 S.Ct. at 788. The judiciary's proper role in a case such as *Tenney,* the Court wrote, is limited to "determining that a committee's inquiry may fairly be deemed within its province." *Id.* at 378, 71 S.Ct. at 789.

In *Eastland,* a congressional subcommittee had subpoenaed the United States Servicemen's Fund's (USSF) bank records. On first amendment grounds, the USSF sought an injunction against release of the subpoenaed records; the USSF charged that the *purpose* of the subpoena was to chill the organization's free speech. The Court declared first that congressional investigation generally is sheltered by the Speech or Debate Clause and next determined that the USSF was a proper subject for subcommittee investigation. *See* 421 U.S. at 505–06, 95 S.Ct. at 1822–23. The Court then stated that "in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it." *Id.* at 508, 95 S.Ct. at 1824 (citations omitted). Instructed by *Tenney* and *Eastland,* we must disallow pursuit in court of the charge that the McClellan Subcommittee's investigation, in targeting the McSurelys, in fact had as its objective

---

**18.** The *Tenney* Court ruled that the 1871 Civil Rights Act did not abrogate the immunity traditionally extended to state lawmakers acting

within the sphere of legislative activity. *See* 341 U.S. at 376, 71 S.Ct. at 788.

harassment, intimidation, and stigmatization of the plaintiffs in order to squelch exercise of their first amendment rights.

PART IV: *The Privacy Claims*

Following the decision of the en banc court in 1976, the McSurelys amended their complaint to include a claim that their right to privacy under the common law had been violated. *See McSurely II*, 553 F.2d at 1294–96, 1302–03. At trial, testimony was taken on the manner in which Brick gave Margaret McSurely's diary, letters and other highly personal papers, not to her, but to *Alan* McSurely and on the effect that this had on the McSurelys' marriage. We hold that there was more than sufficient evidence to sustain the jury verdicts against Brick for interfering with the McSurelys' right to privacy and that neither the Speech or Debate Clause nor the doctrine of qualified immunity shields Brick from liability for his conduct. The McSurelys, however, did not produce any evidence that could sustain the jury verdicts against McClellan and Adlerman for invasion of privacy. We uphold the privacy verdicts as to Brick, but reverse as to the other Senate defendants.[19]

A. *Invasion of the McSurelys' Right to Privacy Under the Common Law.*

1. *The Return of the McSurelys' Papers*

In July 1968, the Court of Appeals for the Sixth Circuit decided that Ratliff and the U.S. Marshal had to return the documents seized from the McSurelys. After several unsuccessful attempts to secure Ratliff's compliance with the decision, the McSurelys obtained a court order directing Ratliff to turn over the documents to them at the U.S. Marshal's office in Pikeville on November 8, 1968. Adlerman sent a memo to Ratliff requesting that Ratliff coordinate return of the documents with the Subcommittee's efforts to serve new subpoenas on the McSurelys. Plaintiffs' Exhibit No. 38, *reprinted in* J.A. 1851. On the appointed day, the McSurelys—accompanied by Joe and Karen Mulloy, another couple whose home had been searched and whose effects had been seized—brought a van to the federal building to pick up their papers. The materials had been deposited in two jail cells located inside the building. Alan McSurely testified about what happened when the McSurelys and the Mulloys proceeded down the hall toward the cells:

> Just as we were starting down there, this guy, John Brick, said to me, "Hey, Alan, come here, I want to say something to you." So I went over to one side with him and he said, "I have this box here full of your documents, and I want to go over them with you and have you check it off to make sure you received them."

Tr. of Nov. 23, 1982, at 95, *reprinted in* J.A. 601. Alan McSurely then followed Brick over to an area in front of a large window and, in accordance with Brick's instructions, began going through the contents of the box piece by piece.

The documents that had been in the Subcommittee's possession included both Alan and Margaret McSurely's personal correspondence with friends and relatives. Among the papers were a diary written by Margaret McSurely and personal letters written to her by men with whom she had been intimately involved. Brick pressed Alan McSurely to read through each and every document and verify that the xerox copies were the same as the originals. It was this incident which provides the evidence on which the jury verdict for the McSurelys properly rests. We quote from Alan McSurely's testimony at length concerning the manner in which the documents—including the items that clearly belonged solely to Margaret McSurely—were shown to him:

> When I got down to number six on the list, ... it was a series of notes that Margaret had made back in 1963 and '64

19. The jury awards for violations of the right of privacy under common law were as follows:

| | Ratliff | McClellan | Adlerman | Brick |
|---|---|---|---|---|
| Alan McSurely | $30,860 | $19,640 | $9,923 | $11,660 |
| Margaret McSurely | $25,640 | $13,340 | $7,000 | $ 9,400 |

when she was working for Drew Pearson.

As I was reading it, I realized that this was the famous diary that we heard about. I had never seen it before. I never looked at it before. I was, you know, just totally stunned by what I saw there. It was the most intimate details of her relationship with Mr. Pearson, and I wasn't stunned by what I was reading, but I was stunned by the fact that, you know, it just dropped on me like a pipe, a lead pipe right on my shoulders, that these guys, this guy standing right here in front of me, I mean, we were only standing maybe a foot apart, had taken this stuff, taken it up to the Senate and kept it up there for a year, and said that they were investigating the riots.

I couldn't hardly think or feel, I was just totally numb by that. I looked at him, and he, I mean, he was watching and he knew which thing I was reading and he wouldn't look at me, he would look out the window and look down, and then—so I put those aside and I started reading a couple more and got to number 11 and 12, I think it was, somewhere in the 11, 12, 13, and these were very romantic, beautifully-written love letters that Margaret had gotten from a guy that I knew, he was a friend of mine, that she was going with when she went south and worked with SNEC.

And I had never known that, about this affair. I didn't have any right to know about it, it happened a long time before I met her, but I felt, you know, like an intruder, like I was getting into reading something that I had no business to read about Margaret and her past life. If she wanted to tell me about that, it was her business, but she apparently hadn't wanted to tell me about it up till then.

. . . .

Brick got, he kept pushing me to keep on reading this stuff. He would give me these letters and say, "Make sure they are the same now, read them all the way through." . . . But the thing I remember the most was when we got to 201, and this was the, this was another letter that Pearson had written to Margaret when she was in Mississippi, in October of '64, and it was addressed, "Dearest Cucumber," which I had never heard or called that before.

. . . .

It made me sick. I was so furious that I really couldn't concentrate on looking at that stuff. My basic thought was to smash him in his face. That was the way I felt. I have been trained as a psychologist and be cool and to help people figure out ways of expressing their hostility in a constructive manner, et cetera, but at that time the only thing I could think about was to hit this guy. This guy—in the back of my mind, it wasn't just him, it was like a gang rape, he had raped my wife right there while, right in front of me—

*Id.* at 104–08, *reprinted in* J.A. 609–13.

Joe Mulloy also testified about the exchange of documents between Brick and Alan McSurely: "Mr. Brick—I remember him being—it seemed like to me that he knew something that Alan didn't know, and he appeared smug and he would grin from time to time, and Alan was having to read these documents, and this was—it was a tense day, certainly, for all of us." Tr. of Dec. 2, 1982, at 46, *reprinted in* J.A. 810. Alan McSurely, Mulloy recalled, "was holding some of [the documents] in his hands like this . . . and just like he was getting rigid . . . this was his first opportunity to see the things." *Id.* at 46–47, *reprinted in* J.A. 810–11.

Margaret McSurely herself testified to her feelings of violation and mortification, and to her belief that the treatment given her personal papers, including the display of each and every one of them to her husband, had undermined and ultimately destroyed her marriage.

Yes. I watched and . . . I saw they had taken some love letters of mine. And I was really embarassed. I couldn't believe that they would do anything that dirty, and I kind of walked away and

looked out the window, and I remember Karen came up and put her arm around me. And I would go back and see what else they had taken and I saw him give back an address list, and it was like my worst fears, my worst, worst fear.

Tr. of Dec. 3, 1982, at 11–12, *reprinted in* J.A. 890–91. Margaret McSurely testified that she was conscious of the impact the revelation was having on her husband and feared for the future of their relationship.

I noticed he was trying to control his anger, and that frightened me because I didn't know what effect all of this stuff was going to have, what it was going to mean to him. It was like all these things were happening at once and it was almost more than I could take in. I have never been so humiliated.

Tr. of Dec. 3, 1982, at 12, *reprinted in* J.A. 891. Margaret McSurely testified that after the couple got home with their papers,

Joe and Karen, Al and I sat down and he took the stuff out of the box and put my things in one pile and gave it to me, and said, "Here, these are yours, is what Brick took to Washington."

And I took my stuff in another room because I didn't want anybody else to see me and I ran through and saw what they had taken, and I was devastated.

Tr. of Dec. 3, 1982, at 15, *reprinted in* J.A. at 894. After the return of the papers, she continued to feel "very frightened," Tr. of Dec. 3, 1982, at 63, *reprinted in* J.A. at 934, and was plagued by "a sense of foreboding, a sense of doom." *Id.* She "couldn't sleep" and "looked over [her] shoulder all the time." *Id.* While her husband was at work, she stayed home alone and "cried just about every day." Tr. of Dec. 3, 1982, at 64, *reprinted in* J.A. 935.

Alan McSurely asserted that he believed there had been "an assault on the trust and love between Margaret and me, which I am not sure we ever overcame." Tr. of Nov. 23, 1982, at 137, *reprinted in* J.A. 640.

Margaret McSurely testified that the feelings of injury and embarrassment persisted and eventually poisoned the McSurelys' marital relationship. Even at the trial, years later, she found the matter painful and difficult to articulate:

If I could find the words, I will try to tell you.... [T]here were some seeds of mistrust that came between Al and me, ... and ultimately our marriage broke up.

... [I]t was an insidious thing that ... faded away our relationship.

Tr. of Dec. 3, 1982, at 16–17, *reprinted in* J.A. 937–40. Pressed again to describe the emotional damage she had suffered, Mrs. McSurely testified

I have not been able to develop any other relationships with men since Al left.

. . . .

And the worse thing is the marriage breaking up, the affect it had on the family.

Tr. of Dec. 3, 1982, at 18, *reprinted in* J.A. 941.

The district judge gave the jury a general instruction concerning invasion of privacy under the common law. He told them:

Now, the right of privacy is generally recognized as the right to be left alone. That is to say, the right of a person to be free from unwarranted publicity, or the right to live without unwarranted interference by the public about matters with which the public is not necessarily concerned. A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others, is liable to that person. Disclosure to the general public is not necessary to complete the wrong of invasion of privacy.

Jury Instructions, Tr. of Jan. 5, 1983, at 24–25, *reprinted in* J.A. 1703–04. The jury returned verdicts against all three defendants for invading Alan and Margaret McSurely's right to privacy under the common law.

### 2. *Choice of Law*

■ The people and events involved in the McSurelys' privacy claim were affiliated with two jurisdictions: the District of

Columbia and the State of Kentucky. The suit was brought in the District and several of the defendants were associated with the United States Senate when the alleged tort occurred. On the other hand, most of the allegedly tortious conduct occurred in Kentucky at a time when both plaintiffs were Kentucky residents.

The privacy claim has been pursued in this case under the wing of the federal court's pendent jurisdiction. *McSurely II,* 553 F.2d at 1303. In such cases, by analogy to cases entertained under diversity jurisdiction, federal courts have applied the rule of *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 428–29 (3d Cir.1982); *Systems Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1136 (3d Cir.1977). *Klaxon* directs us in this case initially to District of Columbia choice of law rules.

We believe that in the situation at hand, the District's choice of law analysis would identify Kentucky as the state most concerned with the claim and best equipped to provide the regulating substantive rule. *Cf. Gaither v. Myers,* 404 F.2d 216, 222 (D.C.Cir.1968); *McCrossin v. Hicks Chevrolet, Inc.,* 248 A.2d 917, 920–21 (D.C.Ct. App.1969); *see also Loge v. United States,* 662 F.2d 1268, 1273 (8th Cir.1981); *Semler v. Psychiatric Institute of Washington, D.C., Inc.,* 575 F.2d 922, 924 (D.C.Cir.1978). Both the nature of each jurisdiction's interest in the claim and the state of development of privacy law lead us to this conclusion.

As we have noted, Kentucky was the place from which the documents were taken and to which they were returned. It was also the McSurelys' domicile and, more to the point, the place where the wrong was done and the harm was initially felt. Furthermore, we held in *McSurely II* that any use of the documents by Subcommittee members and their staffs while the papers were in the District came within the shelter of the Speech or Debate Clause.

We discern no substantial disparity in the premises underlying privacy tort law in the two jurisdictions. Delineation of an invasion of privacy tort is a fairly recent development at common law. Elaborative case law is sparse in both jurisdictions. Kentucky, however, recognized the tort approximately forty years before its existence was acknowledged in the District. *Compare Brents v. Morgan,* 221 Ky. 765, 773–74, 299 S.W. 967, 971 (Ky.1927) *with Afro-American Publishing Co. v. Jaffe,* 366 F.2d 649, 653 (D.C.Cir.1966) (en banc). Kentucky, therefore, has had longer experience in this evolving area. We turn, therefore, as we think local courts in the District would, to Kentucky law to govern our analysis of the privacy invasion asserted by the McSurelys.

### 3. The Right to Privacy under Kentucky Law

In a seminal *Harvard Law Review* article, Samuel D. Warren and Louis D. Brandeis laid the groundwork in 1890 for the development of a "new" tort designed to protect individuals from unwarranted interference in their personal affairs. Warren & Brandeis, *The Right to Privacy,* 4 Harv. L.Rev. 193 (1890). Their theory was predicated on recognition that the scope of legal protection available to individuals had already expanded to cover not only batteries on persons and trespasses to property, but also intangible injuries to feelings and sensibilities. Warren and Brandeis urged that the law go further and respond to "modern enterprise and invention [which] have, through invasions upon [an individual's] privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury." *Id.* at 196.

Beginning with *Pavesich v. New England Life Insurance Co.,* 122 Ga. 190, 50 S.E. 68 (1905), state courts gradually recognized the new tort, and, by 1960, the majority of jurisdictions acknowledged the right of privacy, "in one form or another." Prosser, *Privacy,* 48 Calif.L.Rev. 383, 386 (1960). In 1960, William Prosser analyzed evolving privacy law and concluded that

the right of privacy actually comprised four distinct torts:

1) intrusion into an individual's seclusion or private affairs;

2) publication of embarrassing private facts about an individual;

3) publications that place an individual in a false light in the public eye, but do not constitute defamatory statements; and

4) appropriation of an individual's name or likeness for commercial advantage.

*Id.* at 389. The *Restatement* has adopted Prosser's four-pronged delineation of the invasion of privacy tort. *See Restatement (Second) of Torts* § 652A (1977).

Kentucky was among the first states to hold invasion of privacy an actionable tort. *See Brents v. Morgan,* 221 Ky. 765, 770–74, 299 S.W. 967, 969–71 (1927); *see also Foster-Milburn Co. v. Chinn,* 134 Ky. 424, 432, 120 S.W. 364, 366 (1909) (citing *Pavesich v. New England Life Insurance Co.,* 122 Ga. 190, 50 S.E. 68 (1905)); *see generally* Bunch, *Kentucky's Invasion of Privacy Tort—A Reappraisal,* 56 Ky.L.J. 261 (1968).

In *Brents,* the defendant placed a notice in the show window of his place of business announcing that the plaintiff owed the defendant money, had promised often to pay, but had failed to do so. The court held that the plaintiff's claim of mental pain, humiliation, and exposure to public ridicule resulting from the notice was actionable. In so holding, the court explained that the right of privacy

has not been concretely defined, and probably is not subject to a concrete definition, but it is generally recognized as the right to be let alone, that is, the right of a person to be free from unwarranted publicity, or the right to live without unwarranted interference by the public about matters with which the public is not necessarily concerned.

*Brents v. Morgan,* 221 Ky. at 770, 290 S.W. at 969–70. The court made clear that the plaintiff "is entitled to recover substantial damages, although the only damages suffered by him resulted from mental anguish." *Id.* at 774, 290 S.W. at 971.

Four years later, Kentucky held wiretapping actionable as an invasion of privacy. *Rhodes v. Graham,* 238 Ky. 225, 37 S.W.2d 46 (1931). The court there concluded:

A person is entitled to the privacy of his home as against the unwarranted invasion of others, and a violation thereof will give rise to an action. It is the legal right of every man to enjoy social and business relations with his friends, neighbors, and acquaintances, and he is entitled to converse with them without molestation by intruders.

*Id.* at 228, 37 S.W.2d at 47.

Kentucky has continued to adhere to the principles set forth in these early opinions. For example, in 1967, the year that the McSurelys' papers were seized, the court again reviewed the development of the privacy tort, describing the doctrine as "well established" despite the paucity of cases and asserting that the privacy tort's purpose is "primarily to recover for a hurt to the feelings of the individual." *Wheeler v. P. Sorenson Mfg. Co.,* Ky., 415 S.W.2d 582, 584 (1967). The court stated that the doctrine was an evolving one, not wedded to rigid rules or standards: "[T]he right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man." *Id.* at 585.

Three years ago, Kentucky adopted the privacy tort analysis set forth in the *Restatement (Second) of Torts* as a means of furthering the principles enunciated in its prior opinions. *See McCall v. Courier-Journal & Louisville Times Co.,* Ky., 623 S.W.2d 882, 887 (1981); Ausness, *Kentucky Tort Laws: Defamation and the Right to Privacy* (Book Review), 72 Ky.L.J. 199, 205 (1983–84); *see generally* D. Elder, *Kentucky Tort Law: Defamation and The Right to Privacy* § 3.01 (1983). In *McCall,* the court quoted the *Restatement's* four-part breakdown of the privacy tort, but also repeated its statement in *Brents* that the tort of invasion of privacy is "not subject to precise definition." *McCall,* 623 S.W.2d at 887.

Under the *Restatement,* an intrusion is tortious when it involves intentional interference with the "solitude or seclusion of another or his private affairs or concerns" *and* "would be highly offensive to a reasonable person." *Restatement (Second) of Torts* § 652B. The intrusion tort "does not depend on any publicity given to the person whose interest is invaded or to his affairs." *Id.* comment a; *see, e.g., Pearson v. Dodd,* 410 F.2d 701, 704 (D.C.Cir.1969); *Fowler v. Southern Bell Telephone & Telegraph Co.,* 343 F.2d 150, 156 (5th Cir.1965). The defendant is subject to liability "when he has intruded into a private place, *or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Restatement (Second) of Torts,* § 652B comment c (emphasis added).

The *Restatement* defines the publication of private facts tort as follows:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public.

*Id.* § 652D. The publication of private facts doctrine usually applies to communications made to the public at large, rather than a few individuals. *See id.* comment a. However, the publication requirement also may be satisfied by proof of disclosure to a very limited number of people when a special relationship exists between the plaintiff and the "public" to whom the information has been disclosed.

In *Beaumont v. Brown,* 401 Mich. 80, 257 N.W.2d 522 (1977), for example, the court emphasized the nature of the relationship between the plaintiff and the recipient of the communication:

Communication of embarrassing facts about an individual to a public not concerned with that individual and with whom the individual is not concerned obviously is not a "serious interference"

with plaintiff's right to privacy, although it might be "unnecessary" or "unreasonable". An invasion of a plaintiff's right to privacy is important if it exposes private facts to *a public* whose knowledge of those facts would be embarrassing to the plaintiff. Such a public might be the general public, if the person were a public figure, *or a particular public such as fellow employees, club members, church members, family, or neighbors, if the person were not a public figure.* *Id.* at 104–05, 257 N.W.2d at 531 (emphasis added). Declining to place a numerical requirement on the "publication" element of the tort, the court simply noted that "[h]ere we have developed the criterion of a particular public, whose knowledge of the private facts would be embarrassing to the plaintiff ...." *Id.* at 105, 257 N.W.2d at 531. Moreover, the court observed that there was respectable opinion supporting the idea that "publication of the embarrassing facts to only one person alone was unlawful publication." *Id.* at 100, 257 N.W.2d at 529.

The closest Kentucky has come to an analysis of the publication requirement occurred in *Voneye v. Turner,* Ky., 240 S.W.2d 588 (1951). The court held that, given the particular facts of the case, Voneye's privacy had not been violated but made it clear that the size of the "public" was not relevant to whether a disclosure of embarrassing facts was tortious.

Two other Kentucky cases, *Gregory v. Bryan-Hunt Co.,* 295 Ky. 345, 174 S.W.2d 510 (1943), and *Sellers v. Henry,* Ky., 329 S.W.2d 214 (1959), also indicate that the size of the public is irrelevant, and such is the conclusion of the most recent treatise on Kentucky tort law, *see* D. Elder, *supra,* § 3.04.

In sum, Kentucky has adopted the *Restatement's* articulation of privacy tort principles but has continued to emphasize the need for flexibility in the application of theory to conduct. Egregious conduct has been found actionable even where the fit to the recognized privacy tort categories has not been exact. It is with these points in mind that we look at the evidence and

instructions presented to the jury in this case.

### 4. *Liability of Brick*

Although the trial court might have given a more detailed privacy charge, we cannot say that the formulation given was not an adequate statement of Kentucky law. The jury had more than sufficient evidence from which it could conclude that John Brick "unreasonably and seriously interfere[d] with [the McSurelys'] interest in not having t[heir] affairs known to others."

Alan McSurely's right to be "let alone"—to not have John Brick stand by his side and pressure him to read about the intimate details of his wife's premarital relationships and to not have his marriage maliciously disrupted—is the type of privacy interest protected by the tort of intrusion. Brick's conduct, which indisputably was "highly offensive to a reasonable person," constituted an intrusion into Alan McSurely's "private affairs and concerns"—in this case, his marital relationship.

Margaret McSurely's right to be let alone was at least as invaded when Brick intruded into her marriage, dredging up her past, directing her husband's attention to matters about which he neither needed nor wanted to know, and creating problems in a relationship which had up until then been satisfactory.

The drafters of the *Restatement* noted that it is "possible and not infrequent" for a particular act to constitute more than one of the four types of privacy torts. *Restatement (Second) of Torts* § 652A comment d. Such is the case here. As to Margaret McSurely, Brick's conduct also constituted a tortious publication of private facts. By giving Margaret McSurely's private papers to Alan McSurely and pressing him to read them, Brick published to the most significant possible audience embarrassing facts about Margaret McSurely's private life before her marriage. A rational jury could very readily find that Brick's conduct served no legitimate public interest and was highly offensive by the standards of ordinary people.

Given the nature of Margaret McSurely's papers, Brick's conduct in giving them to Alan McSurely and—under the guise of conducting official business—pushing Alan to read each and every one through, page by page, as Brick watched invaded both Alan and Margaret McSurely's privacy. Whether construed as an invasion of a "private seclusion that [the McSurelys] ha[d] thrown about [their] person or affairs" under the "intrusion" tort, *Restatement (Second) of Torts* § 652B comment c (1977), or, in Margaret McSurely's case, as the publication of embarrassing private facts, *see id.* § 652D, we believe that Brick's conduct would be actionable under Kentucky law. In light of the content of the papers and of Alan and Margaret McSurely's relationship as husband and wife, the evidence at trial was such that a reasonable jury could find Brick liable for invasion of privacy.

Finally, the jury could conclude reasonably that Brick's actions had harmed the McSurelys seriously both as individuals and as a family unit. For this latter point, the jury had not only the subjective testimony about emotional injury but also the objective evidence of the McSurelys' divorce.

### 5. *Liability of McClellan and Adlerman*

Since no one contends that either McClellan or Adlerman personally took part in the return of the documents, they must be liable vicariously if at all. The district judge gave the jury general instructions on vicarious liability: if McClellan or Adlerman had "ordered or directed or authorized or approved" Brick's conduct, they could be liable for that conduct "the same as if [they] had done those acts personally." Jury Instructions, Tr. of Jan. 5, 1983, at 29, *reprinted in* J.A. 1708. Although McClellan and Adlerman apparently instructed Brick to return the documents to the McSurelys, there is no evidence that McClellan or Adlerman ordered, directed, authorized, or approved the manner in which he performed that task.

An instruction to return documents normally means restoring the documents to their rightful owner, not giving them to a third party. From the testimony, the jury could reasonably have inferred that McClellan had a grudge against Drew Pearson, desired to place Pearson in a compromising position, and attempted to exploit the McSurelys for that purpose. But evidence of McClellan's motivation, even if the Speech or Debate Clause did not bar its admission, *see supra* p. 103 n. 15, p. 106, would serve only to connect McClellan with the wrongs alleged by the McSurelys under the first and fourth amendments and, we have held, *supra* pp. 99–106, that those claims cannot be sustained. Because we here find liability only for the manner in which the documents were returned, the evidence is insufficient to sustain a finding that McClellan actually or impliedly ordered, directed, authorized, or otherwise approved the tortious manner in which Brick carried out his assignment. The evidence similarly fails to connect Adlerman to the tort.

### 6. The Immunity Defense as to Brick

In *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959), the Supreme Court held that federal officials have absolute immunity from common law tort liability for actions taken "within the outer perimeter of [their] line of duty." *Barr v. Matteo* sets forth a judge-made immunity doctrine that applies to executive branch officials acting within the scope of their employment. Our recent decision in *McKinney v. Whitfield*, 736 F.2d 766 (D.C. Cir.1984), indicates the doctrine's continuing vitality. Protection similar to that afforded executive officials by *Barr* is supplied to members of Congress and their staffs through the Speech or Debate Clause of the Constitution. While *Barr v. Matteo* establishes absolute immunity for executive branch activity "within the outer perimeter" of an executive official's line of duty, the Speech or Debate Clause provides absolute immunity for conduct that is "part and parcel of the legislative process." *Gravel v. United States*, 408 U.S. 606, 626,

92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). *Gravel* applied this protection to legislative staff as well as members of Congress, and thus the question of absolute immunity is appropriately raised by Brick who was, at the time, a member of Senator McClellan's staff and a Subcommittee investigator.

The "absolute immunity" of the Speech or Debate clause, however, cannot be used as a talisman to insulate all conduct of all legislative branch personnel at all times. The Supreme Court has instructed that absolute immunity for members of Congress only protects "conduct necessary to perform their duties within the sphere of legitimate legislative activity." *Davis v. Passman*, 442 U.S. 228, 235 n. 11, 99 S.Ct. 2264, 2271 n. 11, 60 L.Ed.2d 846 (1979).

We recently outlined the limitations of the immunity secured by the Speech or Debate Clause in *Walker v. Jones*, 733 F.2d 923 (D.C.Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). In determining whether an activity is protected by Speech or Debate immunity:

> The key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor. Activities integral to the legislative process may not be examined, but peripheral activities not closely connected to the business of legislating do not enjoy Speech or Debate shelter.

*Id.* at 929 (citation omitted). Acts " 'casually or incidentally related to legislative affairs' but not 'part and parcel of the legislative process' are outside the realm of Speech or Debate protection." *Id.* (quoting *Gravel v. United States*, 408 U.S. at 626, 92 S.Ct. at 2627). As Judge Leventhal said in his opinion in *McSurely II*, "[t]he employment of unlawful means to implement an otherwise proper legislative objective is simply not 'essential to legislating' " and, therefore, is not protected by the Speech or Debate Clause. 553 F.2d at 1288. Converting what should have been the simple physical return of documents to their respective owners into the sadistic and voyeu-

ristic exercise described at trial cannot fall under the mantle of necessary legislative conduct. In sum, Brick's behavior—the manifestly excessive means he used when he returned the McSurelys' private papers —"offend[s] even hardened sensibilities." *Cf. Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). It surely constitutes the kind of interference that the highest court of Kentucky would consider "unwarranted" and "highly offensive." It is not even arguably within the outer perimeter of a public official's line of duty. *See McKinney v. Whitfield, supra.*

 Nor does *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), provide any protection for Brick's violation of the McSurelys' right to privacy under the common law. That case defined "qualified immunity" for various federal officials in situations in which they could not lay claim to absolute immunity. While this court has said that qualified immunity may apply to legislative branch personnel, *Walker v. Jones*, 733 F.2d at 932, that doctrine has never been held to shelter from common law tort liability conduct of the kind at issue here—behavior that plainly steps beyond even the extreme edge of an official's authority.

PART V: *Conclusion*

If hard cases make the law bad, then ancient cases make the law confusing. This ancient controversy first saw the light of a courtroom in Kentucky in 1967. Since then the McSurelys have litigated in the district courts of the Eastern District of Kentucky and the District of Columbia, the Courts of Appeals of the Sixth Circuit and the District of Columbia Circuit, and in the United States Supreme Court. The McSurely matter has occasioned *seven* Court of Appeals decisions, including one en banc opinion. In addition the various litigants have made four motions before the Supreme Court and filed a petition for certiorari, which was ultimately dismissed as improvidently granted.

Every source of law, from the United States Constitution to Kentucky common law, has been probed and pressed for solutions to the questions presented. The divisions among judges have been substantial—this court divided six to four, and even five to five, on some of the most fundamental legal questions raised by the disputants. Three of the defendants have died during the long pendency of this lawsuit, and, in one instance, the party substituted for a deceased defendant has also died.

The curtain ought to be drawn. The legal world will little note nor long remember the fine lines that have been drawn in this opinion or in any of the four previous opinions rendered by this court. It will be enough if our opinion finally ends this sorry chapter of investigative excess. The McSurelys cannot be made whole, nor can they be vindicated. Those parts of the district court's judgment that we uphold today can only stand as a small reaffirmation of the proposition that there are bounds to the interference that citizens must tolerate from the agents of their government—even when such agents invoke the mighty shield of the Constitution and claim official purpose to their conduct.

APPENDIX

The McSurelys were involved in the following related lawsuits:

1) *Challenge to the Validity of the Kentucky Sedition Statute.* Shortly after they were arrested, the McSurelys brought suit in federal district court to prevent the Kentucky prosecutor, Thomas Ratliff, from proceeding with any prosecution of the McSurelys under the state sedition statute, Ky.Rev.Stat. § 432.040. A three-judge panel, one judge dissenting, found the statute unconstitutional on its face. *McSurely v. Ratliff*, 282 F.Supp. 848 (E.D.Ky.1967). The court ordered Ratliff and the U.S. Marshal to retain possession of the seized material pending appeal. No appeal was ever taken.

2) *Suit to Enjoin Ratliff and the U.S. Marshal from Complying with the Senate*

*Subpoenas.* As soon as the McSurelys received the Senate subpoenas for documents held in Ratliff's custody, they asked the three-judge district court to issue a temporary restraining order to prevent compliance with the subpoenas. This is the chronology of their effort to block compliance with the subpoenas:

*October 18, 1967:* The McSurelys filed their motion for a temporary restraining order in the district court.

*October 23, 1967:* The three-judge court denied the motion and ordered all parties to cooperate with the Subcommittee.

*November 10, 1967:* The Supreme Court stayed the district court order on condition that the McSurelys obtain a ruling on the validity of the subpoenas. 389 U.S. 949, 88 S.Ct. 313, 19 L.Ed.2d 358 (1967).

*December 5, 1967:* A hearing was held before the district court on the validity of the subpoenas. At that hearing, the McSurelys learned, for the first time, that John Brick, a Subcommittee investigator, had taken copies of 234 documents to Washington and that those copies were still in the Subcommittee's possession. Brick refused to tell the McSurelys which documents the Subcommittee had.

*December 13, 1967:* The district court again ordered compliance with the subpoenas.

*January 29, 1968:* The Supreme Court granted another stay, reserving for future determination whether it had jurisdiction of the appeal from the district court. 390 U.S. 914 (1968).

*March 18, 1968:* The Supreme Court dismissed the appeal for want of jurisdiction, but continued the stay so that the McSurelys could seek review in the Court of Appeals for the Sixth Circuit. 390 U.S. 412 (1968).

*July 29, 1968:* The Court of Appeals for the Sixth Circuit reversed the district court's order that Ratliff comply with the subpoenas. In a short per curiam opinion, the court held that the material must be returned to the McSurelys because the district court's right to retain the material expired once the time for appeal had elapsed. *McSurely v. Ratliff,* 398 F.2d 817 (6th Cir.1968).

3) *Contempt Proceedings.* After the McSurelys refused to comply with the subpoenas, the Senate approved a resolution authorizing the Justice Department to prosecute them for contempt of Congress. S.Res. 191, 91st Cong., 1st Sess. (1969). They were convicted in district court, but this court reversed their convictions on appeal. *United States v. McSurely,* 473 F.2d 1178 (D.C.Cir.1972).

4) *Suit for Damages.* The McSurelys and several other plaintiffs initially brought the instant suit against various Senate defendants to prevent them from proceeding with the criminal contempt prosecution and to seek damages. This court considered three interlocutory appeals arising from this lawsuit.

*McSurely I,* 426 F.2d 664 (D.C.Cir.1970): The district court stayed all proceedings in the suit until final disposition of the contempt prosecution. We reversed that order as overbroad and remanded for further proceedings.

*McSurely II:* Following this court's decision in *McSurely I,* the McSurelys amended their complaint to proceed on the damages claims against various Senate defendants and Thomas Ratliff. The Senate defendants sought dismissal of the complaint on the ground that they were immune from liability under the Speech or Debate Clause. The district court denied their motion. A panel of this court reversed in part and affirmed in part. That panel decision, which is reported at 521 F.2d 1024, was vacated by the en banc court. This court, sitting en banc, unanimously agreed to dismiss most of the claims against the Senate defendants, but was equally divided over certain other claims. Those claims were remanded to the district court. 553 F.2d 1277 (D.C.Cir.1976) (en banc). The Senate defendants petitioned for a writ of certiorari, which the Supreme Court granted. 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977). Following oral argument, however,

the Court dismissed the writ. 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

*McSurely III:* On remand, Thomas Ratliff filed his own motion for summary judgment, which the district court denied. We affirmed the denial of Ratliff's summary judgment motion in a per curiam opinion. 697 F.2d 309 (D.C.Cir.1982).

*McSurely IV:* Following a trial and jury verdicts in favor of the McSurelys, the defendants brought this appeal. After Thomas Ratliff entered into a settlement agreement with the McSurelys, we dismissed his appeal.